**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DINO KURT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FLY-E GROUP, INC., ZHOU OU, and SHIWEN FENG,<br><br>Defendants. | **Case No. 1:25-cv-05017-RER-CHK**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**Demand For Jury Trial** |

# TABLE OF CONTENTS

Page


INTRODUCTION ........................................................ 1

JURISDICTION AND VENUE ........................................................ 6

Parties ........................................................ 6

Substantive Allegations ........................................................ 8

I. Factual Background ........................................................ 8

A. 2018-2021: Fly-E is Founded and Grows Amid a Food Delivery Boom in Big Cities ........................................................ 8

B. (2022-September 2023): Demand for Electric Micromobility Vehicles Continues to Increase but Widespread Fires and Safety Concerns Lead to Regulatory Enforcement of the Industry ........................................................ 10

C. Fly-E Did Not Comply with UL Certification Law, But States Otherwise ........... 14

II. False and Misleading Statements in the Registration Statement ........................................................ 16

III. Additional False and Misleading Statements During the Class Period ........................................................ 20

IV. Additional Allegations of Scienter ........................................................ 30

A. Defendants Admitted Having Access to the Information Concealed from Investors ........................................................ 30

B. That the Misrepresentations Concerned the Core Operations of the Company Bolsters an Inference of Scienter ........................................................ 31

C. That Defendants Certified Fly-E's Annual and Quarterly Filings to Investors Bolsters Scienter ........................................................ 32

D. The Company's Precarious Position Supports an Inference of Fraud ........................................................ 33

E. The Widespread Resignations Among Senior Officers and Board Members at the Company Support Scienter ........................................................ 34

V. Corrective Events ........................................................ 34

PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................................ 36

COUNT I (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants) ....................38

COUNT II (Violations of Section 20(a) of the Exchange Act Against Defendants Ou, Guo, and Shiwen Feng) ....................41

PRAYER FOR RELIEF ....................43

DEMAND FOR TRIAL BY JURY ....................43

Lead Plaintiffs Fredrik Melin ("Melin") and Ringkallens Holding AB, ("Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, inter alia: (a) review and analysis of relevant filings made by Fly-E Group, Inc. ("Fly-E" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Fly-E's public documents, press releases, and stock chart; (c) review of Company admissions from other litigation concerning the safety and design of Company products; (d) review of government safety data and violation databases that concern the Company and its retail stores; (e) analysis of securities news articles and advisories concerning the Company; and (f) information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## INTRODUCTION

1. This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Fly-E's common stock between June 6, 2024, and August 14, 2025, both dates inclusive ("Class Period"), asserting claims against Defendants Fly-E, Zhou (Andy) Ou ("Ou"), Ruifeng (Steven) Guo ("Guo"), and Shiwen Feng, (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

Excluded from the Class are: Defendants, former and current officers, senior managers, and directors of Fly-E, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a 10% or higher interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above; or any person who acquired shares via conversion of an interest in or obligation of Fly-E that existed prior to June 6, 2024, with respect to such shares.

2. Fly-E operates primarily as a seller of electric micromobility vehicles purchased from Chinese manufacturers and rebranded as Fly E-bike EVs (electric vehicles). The electric micromobility vehicles include electric bikes (“e-bikes”), electric scooters (“e-scooters”) and electric motorcycles (“e-motorcycles”). During and after the COVID-19 pandemic, demand for food delivery and packaged goods delivery skyrocketed, leading to a surge in demand for delivery workers, specifically in big cities. New York, for example, where the majority of Fly-E’s stores operate, now has approximately 65,000 food delivery workers.

3. In order to meet demand for e-bikes and other electric micromobility vehicles, unscrupulous sellers rushed these products to production with known safety defects, and without conducting safety engineering known to be necessary. As a result, battery fires increased at an exponential and alarming rate, often while the lithium-ion battery is charging.

4. As a result of these widespread fires, New York and other jurisdictions adopted laws for the safe use of batteries. In particular, New York City adopted laws requiring that electric micromobility vehicles be certified in the Underwriters Laboratories (“UL”) safety standards. UL is an independent safety science organization that tests products for risks such as fire, electric shock, overheating, and battery failure.

5. Once the laws went into effect, New York City began vigorously enforcing compliance with these safety standards, fining the Company dozens of times for failing to comply. Instead of complying with requirements, the Company misrepresented its compliance, including by use of counterfeit UL Certification marks ("UL Certification Marks") in marketing its electric bikes, motorcycles and scooters.

6. Defendants knew all of this information but decided to omit it when peddling shares to investors for their June 6, 2024 initial public offering ("IPO"). Instead, the registration statement and prospectus incorporated therein that Defendants used for the IPO (collectively, "Registration Statement") said that they were in compliance with all applicable safety standards, that they expected regulations to be a "tailwind to our growth," and that they were "principally engaged" in designing their own products. *See* Paragraphs 51, 57, 69, 79, *infra*. The Registration Statement also hid Fly-E's chronic failure to comply with safety regulations and its use of counterfeit UL Certification Marks ("Counterfeit UL Certification Marks"), as well as the Company's known failure of control over the manufacturing or design of its products. Indeed, in a products liability action, multiple senior employees of the Company testified that the Company was not a manufacturer, did not design the e-bikes, e-motorcycles, or e-scooters, and that its bikes arrived at its facility 90% preassembled from third-party factories overseas, the exact opposite of what the Registration Statement conveyed.

7. About two months after the Company went public, it and certain individual Defendants made additional false statements regarding Fly-E's safety compliance, that Fly-E's growth was the result of the Company's supposed innovation, and product design. For example, on August 9, 2024, Defendant Ou falsely confirmed in a press release that "***[a]ll of our lineup of e-bikes feature UL-certified lithium batteries for safety,"*** hiding the rampant use of Counterfeit

UL Certification Marks as well as the scores of violations received for failure to comply with the law requiring UL Certification. On August 16, 2024, the Company stated in its Quarterly Report that, despite then-pervasive and internally-known violations, "***the Company believes it is in compliance with the relevant regulations in the U.S***." The Company also continued to tout its supposed growth due to the Company's "commitment to innovation," withholding that it was built on failing to comply with the law, and repeating false statements that regulations were a "tailwind" to growth when it knew them to be an impediment.

8. Defendants herein also knowingly misled investors about the Company's safety compliance, supposed innovative technology, and whether Fly-E actually designed or manufactured its products. As confirmed by (1) deposition testimony in a products liability action and in (2) separate admissions in a consent judgment with UL in which Fly-E and its senior officers agreed they had reason to know they were using Counterfeit UL Certification Marks, Defendants were aware that Fly-E lacked authorization to use UL Certification Marks. Defendants also knew about safety problems with the lithium batteries used in Fly-E vehicles from the dozens of violations received from New York City regulators.

9. Defendants also knowingly trumpeted Fly-E as an innovative electric micromobility vehicle company when, in reality, Fly-E primarily resold preassembled non-compliant Chinese-made products while concealing widespread regulatory violations. Defendants Ou, and Fly-E's two CFOs during the Class Period, Steven Guo and Shiwen Feng, reinforced these misrepresentations by signing misleading SEC filings and false Sarbanes-Oxley certifications. The allegations of fraud are further supported by the fact that the misrepresentations concerned the Company's core operation of selling electric micromobility vehicles. The inference of scienter is also bolstered by Fly-E's worsening financial condition and dependence on capital

raises to survive, as well as by the wave of resignations by senior officers and directors shortly after disclosures about battery fires and regulatory problems.

10. On May 28, 2025, after the stock market had closed, the Company disclosed in a Form 8-K filing that it had entered into a settlement agreement with UL, in which the Company agreed to pay UL $1,000,000 and entered into a Consent Judgment and Permanent Injunction and "agreed not to offer for sale, sell, or distribute products with UL Marks that were not tested and certified by UL." On this news, the Company's stock price dropped 9.59% the next trading day, closing at $44.30.[1]

11. On August 14, 2025, Fly-E filed with the SEC an NT 10-Q notice on Form 12b-25 conceding its inability to timely file its Quarterly Report for the first quarter of fiscal year 2026. The filing revealed a significant 32% decrease in Fly-E's net revenue compared to the same period in 2024. Notably, Fly-E stated that the primary driver for the revenue decrease was a decline of "total units sold" as customers were less inclined to purchase e-bikes due to an "increasing number of lithium battery explosion incidents in New York."

12. Investors and analysts reacted immediately to Fly-E's revelation. The price of Fly-E's common stock declined dramatically. From a closing market price of $155.20 per share on August 14, 2025, Fly-E's stock price fell to close at $20 per share on August 15, 2025, a decline of more than 87% in the span of just a single day. The stock continued to drop the next trading day, closing at $16.02 on August 18, 2025.

13. Fly-E shares now trade at less than 1% of the IPO price. As a result of the deceptive acts and omissions alleged herein, and the precipitous decline in the market value of the

[1] The stock prices reflected herein account for the 1 for 5 reverse stock split on July 7, 2025 and 1 for 20 reverse stock split on November 4, 2025. The unadjusted trading price at the time was $1/100^{th}$ of the listed price after accounting for the stock splits.

Company's securities as a result of the partial disclosures and/or materializations of the concealed risks, Plaintiffs and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

14. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this Action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District. Fly-E has its principal place of business in this District and Defendants committed tortious acts and transacted business in this District.

17. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

**Parties**

18. Plaintiffs, as set forth in their previously filed declaration (ECF No. 20-6) acquired the Company's common stock at artificially inflated prices during the Class Period, and were damaged as a result of the federal securities law violations alleged herein.

19. Fly-E is a Delaware corporation with its principal executive offices located at 136-4- 39th Avenue, Suite 202, Flushing, New York 11354. At all relevant times, the Company's

common stock traded on the NASDAQ Capital Market (the "NASDAQ") under the symbol "FLYE."

20. Defendant Ou was, at all relevant times, the Chief Executive Officer of Fly-E. Ou signed Fly-E's Registration Statement and its Annual and Quarterly Reports filed with the SEC on Form 10-K, and Form 10-Q. Ou also certified that the financial information in these filings was accurate and that the filings did not contain any untrue statement of material fact.

21. Defendant Guo served as Chief Financial Officer from December, 2022 until November 6, 2024. Guo signed Fly-E's Registration Statement and the Company's Quarterly Report filed with the SEC on Form 10-Q on August 16, 2024. Guo also certified that the financial information in the August 16, 2024 Form 10-Q was accurate and that it did not contain any untrue statement of material fact. Guo also served on the board of directors of Fly-E.

22. Defendant Shiwen Feng served as Chief Financial Officer from November 7, 2024 until August 20, 2025. Shiwen Feng signed Fly-E's Annual and Quarterly Reports filed with the SEC on Form 10-K on July 15, 2025, and on Form 10-Q on November 19, 2024. Shiwen Feng also certified that the financial information in the July 15, 2025 Form 10-K and the November 19, 2024 Form 10-Q was accurate and that these filings did not contain any untrue statement of material fact.

23. The Defendants possessed the power and authority to control the contents of Fly-E's SEC filings, press releases, and/or other market communications, and exercised that authority in the course of their day-to-day conduct. Because of their positions with Fly-E, their access to material information available to them but not to the public, and their day-to-day responsibilities, the Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public, and that the representations being made were

materially false and misleading and omitted to state material facts. Additionally, the Defendants (Ou and Guo), in signing the Registration Statement, understood that they were liable to investors for any misrepresentations and omissions therein unless they made a reasonable investigation, and had the ability to make such investigation, which would necessarily have exposed them to the material information contradicting the statements to investors made therein.

## Substantive Allegations

### I. Factual Background

### A. 2018-2021: Fly-E is Founded and Grows Amid a Food Delivery Boom in Big Cities

24. Fly-E Group, Inc., and with its subsidiaries is an electric micromobility vehicle company that is principally engaged in selling e-motorcycles, e-bikes, e-scooters and related accessories under the brand "Fly E-Bike."

25. The Company's first store opened in 2018 in New York. Shortly after its IPO, the Company had 39 stores in the United States and one in Canada. As of June, 2024, the Company offered 21 e-bike products, 34 e-scooter products, and 21 e-motorcycle products. At the time of the IPO, 28 of its United States stores were in New York (over 70%). Each store operates as its own subsidiary. The Company was thus heavily reliant and dependent on compliance with New York laws and regulations.

26. Founded by a former food deliverer, the Company focused on serving food delivery workers as well as urban commuters. All vehicles were branded at the Company's single Brooklyn, New York facility.

27. Although Fly-E tells investors that it is "principally engaged in designing" two-wheeled electric vehicles, it actually is principally engaged in reselling goods designed by and purchased from Chinese manufacturers and rebranded as Fly-E electric micromobility vehicles. This was admitted in depositions of senior officers in a products liability lawsuit in the state of

Texas, which Defendants did not disclose to investors during the Class Period, and the deposition transcripts were not publicly available. *Farrow v. Fly E-Bike, et al*., No 2023-35007 (Harris County, Texas). As Fly-E's technology support manager, E Junchao ("Junchao") testified in his deposition when asked if bikes arrive from China assembled, he answered "…90 percent of it [sic] basically have been put together or assembled by the [outside] manufacturers. And when we receive them [] there is a small part of the accessories that we need to put on, then it will work." Deposition of E Junchao 9:9-16, July 10, 2024, *Farrow v. Fly E-Bike, et al*., No. 2023-35007 (District of Harris County, Texas) ("Junchao Dep."). Junchao also admitted that the Company had no manufacturing, either in the United States or in China, and when asked if "Fly E-Bike is just a simple resaler [sic]," Junchao answered "that is correct." Junchao Dep. 103:14-104:3. In another deposition that same day, Rui Feng, the Company's Chief Operating Officer, also confirmed that 90 percent of the assembly takes place by outside manufacturers in China. Deposition of Rui Feng, 22:19-23:1, July 10, 2024, *Farrow v. Fly E-Bike, et al*., No. 2023-35007 (District of Harris County, Texas) ("Rui Feng Dep."). Rui Feng also confirmed at his deposition that, except in limited circumstances, the Company does not design its own bikes, motorcycles, scooters, or even accessories. Rui Feng Dep. 8:9-9:10.

28. The Company sought to market its electric micromobility vehicles to food deliverers seeking cost-effective means of delivering food in densely populated areas. As the Company explained in its Prospectus, with the rise of e-commerce and online shopping, more people in New York City were relying on package deliveries for everyday needs, which could be serviced by electric micromobility vehicles. Fly-E's products were primarily powered by lithium-ion batteries.

## B. (2022-September 2023): Demand for Electric Micromobility Vehicles Continues to Increase but Widespread Fires and Safety Concerns Lead to Regulatory Enforcement of the Industry

29. In the aftermath of COVID-19 restrictions, electric micromobility vehicles such as e-bikes, e-scooters, and e-motorcycles became increasingly popular. In fiscal year 2023 (ending March 2023), the Company had produced over 2,000 e-motorcycles, 6,000 e-bikes, and more than 2,000 scooters. Fly-E profited from this increase in demand: from fiscal year 2022 to fiscal year 2023, Fly-E's net revenue increased by 26.7%, and then increased again by 47.9% year-over-year in fiscal year 2024. Meanwhile, its gross margin percentage increased from 18.9%, to 38.1%, and then to 40.7%, in fiscal years 2022-2024, respectively.

30. Approximately 65,000 delivery workers live in New York City, many of whom rely on electric micromobility vehicles to make deliveries. In order to meet demand for such vehicles, unscrupulous sellers rushed these products to production without sufficient attention to key safety details. As a result, battery fires increased at an exponential and alarming rate. While these fires sometimes occur on routes, they more commonly happen while the lithium-ion battery is charging. In some cases, incompatible chargers fail to shut off once the battery is fully charged, causing the battery to overheat.

31. In others, flammable electrolyte fluid leaks from the battery cells and ignites, triggering a rapid chain reaction. Exploding e-bikes starting large fires became a significant safety concern and attracted attention from news outlets as well as state and local regulators. For example, in 2021 the New York Fire Department (at times "FDNY"), recorded 104 e-bike fires in 2021 versus 44 in 2020, with multiple deaths and injuries linked to lithium-ion batteries.[2] In an

[2] Jason Plautz, NYC Electric Bike Fires on Pace to Double in 2021, Smart Cities Dive (Nov. 10, 2021), https://www.smartcitiesdive.com/news/cities-report-ebike-fires-micromobility-safety/609516/ ("Plautz"); Greg B. Smith, Claudia Irizarry Aponte, Suhail Bhat and Rachel

October 2021 press conference, FDNY Commissioner Daniel Nigro said the fires were a "very serious problem that keeps increasing." Plautz, *supra* at n.2. By 2022, e-bike battery fires were occurring approximately four times per week, with fires occurring most frequently when charging overnight.[3] Below is a chart detailing the increase in exploding battery fires in New York City on a monthly basis from 2021 to early November 2022:




32. According to the FDNY, in 2022, there were at least 208 reported fires due to overheated battery fires that occurred during charging, resulting in 142 injuries and six deaths.[4]

---

Holliday Smith, Where and Why E-Bikes Catch Fire in NYC — And What Can Be Done About It, THE CITY (Nov. 21, 2022), https://www.thecity.nyc/2022/11/21/ebikes-fires-lithium-ion-batteries-delivery-workers

[3] Smith, *et al*., *supra* n. 2.

[4] Peter Charalambous, E-Bike Batteries Raise Safety Concerns Amid Rise in Fires: "Very Hard to Examine," ABC News (Dec. 31, 2022, 4:15 AM), https://abcnews.go.com/Technology/bike-batteries-raise-safety-concerns-amid-rise-fires/story?id=95617246

In response to the increase in fires from electric micromobility vehicle batteries, residential buildings began to ban them inside housing to stem the risk of fires.[5]

33. UL is an independent safety science organization that tests products for risks such as fire, electric shock, overheating, and battery failure. UL has been testing products and authorizing use of the well-known UL Certification Marks on products that conform to applicable safety standards in the United States since at least 1937. UL has registered the UL Service Mark and the UL Certification Marks in the United States Patent and Trademark Office on the Principal Register. UL only allows manufacturers to affix its mark or to claim a product is UL-certified when it in fact has proved it meets the applicable safety standards specified by UL.

34. For e-bikes and other electric micromobility vehicles, UL standards focus heavily on lithium-ion battery safety because defective batteries and chargers can overheat and enter "thermal runaway," an uncontrollable, self-heating state that can lead to smoke, fire, or explosion. UL 2849 addresses the entire electrical system of an e-bike, including the battery, motor, charger, and wiring. UL issued its first certification of e-bikes under UL 2849 in 2020. UL 2272 addresses e-scooters, and similar personal mobility devices.

35. On December 20, 2022, the U.S. Consumer Product Safety Commission ("CPSC") urged manufacturers and importers of e-bikes and other electric micromobility vehicles to comply with UL safety standards, including UL 2849 for e-bikes and UL 2272 for e-scooters.[6] The CPSC

---

[5] Jennifer A. Kingson, Buildings Are Banning E-Bikes Amid Deadly Battery Fires, Axios (Nov. 14, 2022), https://www.axios.com/2022/11/14/apartment-building-ban-e-bikes-battery-fire-micromobility-scooter

[6] Press Release, U.S. Consumer Product Safety Commission, *CPSC Calls on Manufacturers to Comply with Safety Standards for Battery-Powered Products to Reduce the Risk of Injury and Death* (Dec. 20, 2022), https://www.cpsc.gov/Newsroom/News-Releases/2023/CPSC-Calls-on-Manufacturers-to-Comply-with-Safety-Standards-for-Battery-Powered-Products-to-Reduce-the-Risk-of-Injury-and-Death.

press release warned that "failure to adhere to applicable UL safety standards ([] UL 2272 – *Standard for Electrical Systems for Personal E-Mobility Devices* dated February 26, 2019, and []UL 2849 – *Standard for Safety for Electrical Systems for eBikes* . . . and standards they incorporate by reference) may pose an unreasonable risk to consumers of fire and serious injury or death; and that compliance with the relevant UL standards 'significantly reduces the risk of injuries and deaths from micromobility device fires.'" *Id.* (quoting CSPC letter to Manufacturers, Importers, Distributors, and Retailers of Micromobility Devices). Defendant Ou confirmed in his deposition in the Harris County action that the Company had received this CPSC letter. Deposition of Zhou Ou, 61:22-63:15, July 10, 2024, *Farrow v. Fly E-Bike, et al*., No. 2023-35007 (District of Harris County, Texas) ("Ou Dep.").

36. On March 3, 2023, the New York City Council passed Initiative 663 mandating electric micromobility vehicles to be certified by a third-party certification company to satisfy UL 2849 and UL 2272 standards. N.Y.C. Admin. Code § 20-610 (2023),

37. As the City Council explained in its press release the day the law was approved, "[i]n order to be legally sold, these devices and their storage batteries would be required to have been certified as meeting the applicable Underwriters Laboratories (UL) safety standards by an accredited testing laboratory."[7] On March 20, 2023, then-Mayor Eric Adams signed the legislative package into law ("UL Certification Law").[8] Any company selling, leasing or

---

[7] N.Y.C. Council, Council Votes to Strengthen Fire Safety Related to E-Bikes and Lithium-Ion Batteries (Mar. 2, 2023), https://council.nyc.gov/press/2023/03/02/2361/

[8] Mayor's Office of the City of N.Y.C., Mayor Adams Announces Plan to Combat Lithium-Ion Battery Fires, Promote Safe Electric Micromobility Usage (Mar. 20, 2023), https://www.nyc.gov/mayors-office/news/2023/03/mayor-adams-plan-combat-lithium-ion-battery-fires-promote-safe-electric-micromobility.

distributing electric micromobility vehicles such as e-bikes or e-scooters in New York City had until September 16, 2023 to obtain certification.

**C. Fly-E Did Not Comply with UL Certification Law, But States Otherwise**

38. Under the UL Certification Law, each violation was punished "$150 for a first violation, up to $250 for a second violation, and up to $350 for a third or subsequent violation." N.Y.C. Admin. Code § 20-610.1(e). And, "each day in which a violation continues constitutes a separate violation." *Id.* Fly-E had not obtained certification for several of its electric micromobility vehicles, but marketed these products in Fly-E's retail stores, on its website, and in social media pages as UL-certified when they were not.

39. On July 20, 2023, UL emailed Fly-E and Mr. Ou informing them of the unauthorized use of the UL Certification Marks on Fly-E's website and Instagram account. In response, an employee of Fly-E, Monica Xu, responded to UL's email agreeing to remove the UL Certification Marks from Fly-E's website, social media platforms, and retail stores "in one week." However, the Company continued to display the Counterfeit UL Certification Marks without authorization or UL certification.

40. On September 16, 2023, the UL Certification Law went into effect. Immediately, the New York City Department of Consumer and Worker Protection ("Department of Consumer and Worker Protection") began issuing violations to the Company. That day, the Company and its retail stores received 13 Department of Consumer and Worker Protection notices, including six specifically for selling vehicles without the required UL certification.[9] These six UL

[9] The data are available at https://data.cityofnewyork.us/Business/DCWP-Charges/5fn4-dr26/about_data. The other seven notices of violations included operating without required licenses as a second-hand dealer (NYC Admin Code § 20-412 and § 20-105) and failing to comply with consumer protection rules by not properly displaying refund policies (6 RCNY § 5-37), service price lists (6 RCNY § 5-70(a)), and total selling prices. NYC Admin Code § 20-708.

Certification Law violation notices included 30 different charges, of which the Company pled guilty to ten of them.

41. Between September 2023 and December 2023, UL discovered additional signage at Defendants' retail stores in New York City and Forest Hills, New York, including FLY-E's retail store located on 4130 Broadway, claiming UL certification for electric micromobility vehicles that were not, in fact, certified, as shown below:






42. On September 19, 2023, UL emailed Monica Xu again requesting that Defendants correct their advertisements. On September 20, 2023, Monica Xu responded that he had directed the store to remove the advertisements.

43. Meanwhile, widespread safety violations continued throughout the rest of 2023, with the Company receiving 36 notices of violations of the UL Certification Law that year. These included 137 charges, of which the Company was found guilty of 61 violations.

44. The Company continued to receive UL Certification Law violation notices in the lead-up to its IPO, including 25 such notices between January and May 2024, for a total of 65 charges. Of these, the Company was found guilty of 51 violations.

45. As it was receiving these express violations, Defendants filed the Registration Statement with the SEC, consisting of an initial draft Form S-1 on February 2, 2024, amended on April 4, 2024, April 22, 2024, and May 3, 2024, and by the final prospectus on Form 424(b)(4) filed on June 5, 2024. As specified above, Fly-E was the issuer of the IPO shares pursuant to the Registration Statement, and Defendants Ou and Guo signed the Registration Statement.

46. On June 6, 2024, Fly-E went public on the back of the false and misleading statements in the Registration Statement. The Registration Statement expressly advised investors ***to avoid doing their own due diligence***, and instead to rely ***solely*** on the misleading information provided or incorporated into that document: "No dealer, salesperson or other person is authorized to give any information or to represent anything not contained in this prospectus. ***You must not rely on any unauthorized information or representations***."[10]

## II. False and Misleading Statements in the Registration Statement

47. In the Registration Statement, Fly-E and the signing Defendants made the following representation regarding the Company's compliance with local laws:

> ***The electric mobility industry is subject to rapidly changing and often complex regulatory environments.***
>
> The electric mobility industry is subject to rapidly changing and often complex regulatory environments at local, state, national, and international levels. Evolving regulations related to safety standards, emissions, licensing, and operational requirements can have a substantial impact on our business operations and profitability. Compliance with these changing regulations may necessitate costly modifications to our products, business processes, or market strategies, which could lead to increased expenses and delays in product development and market entry.

[10] Except as otherwise noted, all emphasis herein is supplied.

> Failure to navigate and adhere to evolving regulations adequately could result in legal and financial liabilities, damage to our reputation, and potential market restrictions. Furthermore, inconsistency in regulations between different jurisdictions may create challenges in maintaining uniform business practices and product offerings, increasing our exposure to regulatory risks. Furthermore, a significant portion of our customer base comprises food delivery workers, and if leading food delivery platforms like Uber Eats and DoorDash impose new requirements on the type of electric vehicles they allow, non-compliance on our part could result in the loss of these customers. ***While we believe we are presently in compliance with applicable laws and regulations in our operating regions, there can be no assurance that we can always promptly adapt to the rapidly changing regulatory environment.*** If we fail to effectively adjust to the changing regulatory landscape and comply with applicable laws and regulations in our operating regions, our business, prospects, financial condition and operating results would be materially and adversely affected.

48. The statements identified in Paragraph 47 above were materially false and misleading when made because: (a) the Company was not then in compliance with applicable laws and regulations, including the UL Certification Law, and had received extensive notice of its violations; (b) the statements omitted that the Company was then marketing its products inaccurately as UL-certified at its stores and in its advertisements in violation of local regulations and federal trademark law; and, as a result of (a) and (b), (c) the Company had already incurred significant risk to its business as a result of these known violations.

49. The Registration Statement also made the following representation about UL Certification in its section on "Regulation":

> In addition, some of our products may be subject to local laws and regulations. ***For instance, in March 2023, the New York City Council amended its administrative code to require that all powered bicycles, powered mobility devices including electric scooters, and storage batteries for such mobility devices distributed, sold, leased, rented, or offered for sale, lease, or rental in New York City must be certified as compliant with the applicable Underwriter Laboratories (UL) standard, which is a widely recognized standard for safety in electrical products in the United States.*** The law became effective in September 2023.

50. The statements identified in Paragraph 49 above were materially false and misleading when made because they omitted the following information necessary to make the

statements not misleading under the circumstances in which they were made: (a) that the Company was not then complying with the UL Certification Law and had not fully complied with the law since its inception; (b) that the Company had already received dozens of violation notices for failing to comply with this law; (c) that the Company was then marketing its products inaccurately as UL-certified at its stores and in its advertisements in violation of local regulations and federal trademark law; and, as a result, (d) the Company's failure to comply with laws and regulations was already exposing its business to significant harm.

51. The Registration Statement also claimed that safety regulations would provide a "tailwind" to growth:

> ***Regulatory Landscape***
>
> We operate in an industry that is subject to extensive environmental, safety and other laws and regulations, which include products safety and testing, as well as battery safety and disposal. ***These requirements create additional costs and possible production delay in connection with the testing and manufacturing of our products***. We also benefit from environmental regulations in our target markets which include economic incentives to purchasers of EVs and tax credits for EV manufacturers. ***As such, while we expect environmental regulations to provide a tailwind to our growth, it is possible for other regulations to result in margin pressures***.

52. The statements identified in Paragraph 51 above were materially false and misleading when made because: (a) regulatory requirements were a headwind rather than a tailwind because Fly-E was then not in compliance; (b) the statements omitted that the Company was not then complying with applicable safety laws, including but not limited to the UL Certification Law; (c) the statements omitted that the Company's failure to comply with safety regulations already imperiled its ability to take advantage of the referenced environmental incentives.

53. The Registration Statement also said that the Company assembled all its products at one facility in Brooklyn, and stated as a "risk factor" that its success would depend on its ability to scale up manufacturing:

> ***Our success will depend on our ability to economically produce our vehicles at scale, and our ability to produce vehicles of sufficient quality and appeal to customers on schedule and at scale is unproven.***
>
> Our business success will depend in large part on our ability to economically produce, market and sell our vehicles at sufficient capacity to meet the demands of our customers. We will need to scale our production capacity in order to successfully implement our growth strategy.
>
> ***We currently have one facility in which we assemble all of our products in Brooklyn, New York.*** We have no experience in large-scale production of our vehicles, and we do not know whether we will be able to develop efficient, automated, low-cost production capabilities and processes, such that we will be able to meet the quality, price and production standards, as well as the production volumes, required to successfully market our vehicles and meet our business objectives and customer needs. Any failure to develop and scale our production capability and processes could have a material adverse effect on our business, prospects, financial condition and operating results.

54. The statements identified in Paragraph 53 above were materially false and misleading when made because: (a) little if any actual assembly occurred in Brooklyn, rather, the electric micromobility vehicles were purchased for resale from Chinese manufacturers; and (b) Fly-E actually had no manufacturing facility of its own; and as a result, (c) Fly-E's ability to scale was limited because at the time it had no manufacturing of its own.

55. The Registration Statement also included a representation that 49% of the Company's component parts came from the United States:

> We source a significant portion of our vehicle components from China and the United States. ***For the nine months ended December 31, 2023, 51% and 49% of the parts were from China and the United States, respectively.*** For the years ended March 31, 2023 and 2022, over 40% and 80% of the parts were sourced from China, respectively. ***For the year ended March 31, 2023, we sourced over 50% of our vehicle components from the United States.*** Although we rely on certain principal

> vendors in China and the United States for most of our components, we believe there are multiple sources for each of our critical components.

56. The statements identified in Paragraph 55 above were materially false and misleading when made because: (a) little if any actual assembly occurred in Brooklyn, rather, the electric micromobility vehicles were purchased for resale from Chinese manufacturers; (b) Fly-E actually had no manufacturing facility of its own; and, as a result, (c) the statements that it had sourced approximately 50% of its components from overseas was misleading because it suggested that a significant portion of the manufacturing actually took place in the Company's facility, when it did not.

57. The Registration Statement also included a description of the Company in its Business Overview section, which emphasized that it was "principally engaged in designing" EVs:

> ***We are an electric vehicle ("EV") company that is principally engaged in designing, installing and selling smart electric motorcycles ("E-motorcycles"), electric bikes ("E-bikes"), electric scooters ("E-scooters") and related accessories under the brand "Fly E-Bike."*** At Fly E-Bike, our commitment is to encourage people to incorporate eco-friendly transportation into their active lifestyles, ultimately contributing towards building a more environmentally friendly future.

58. The statements identified in Paragraph 57 above were materially false and misleading when made because: (a) the statements omitted that the Company relied entirely on fully-assembled products purchased from Chinese manufacturers, or products whose assembly was nearly complete when they arrived; and (b) Fly-E was not "principally engaged in designing" or even materially engaged in designing e-motorcycles, e-scooters, or e-bikes, as confirmed by Rui Feng in his deposition in the Harris County matter.

59. None of the aforementioned misrepresentations and omissions was protected by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), because they fell outside the scope of the safe harbor provision.

60. Alternatively, even if otherwise within the scope of the safe harbor provision, the identified misrepresentations and omissions were subject to an exception of the safe harbor provision. According to the PSLRA, the safe harbor does not apply to statements "made in connection with an initial public offering," *see* 15 U.S.C. § 78u-5(b)(2)(D).

### III. Additional False and Misleading Statements During the Class Period

61. On Friday, August 9, 2024, after the market closed, the Company issued a press release in which it falsely boasted that its e-bikes were compliant with the UL Certification Law. Defendant Ou stated the following regarding the Company's participation in an E-bike trade-in program:

> ***"Safety is our top priority, and we believe stringent measures are essential for building trust and fostering adoption. All of our lineup of e-bikes feature UL-certified lithium batteries for safety. We are now thrilled to introduce our new e-bike rental service. Our commitment is to provide a secure and enjoyable electric riding experience. We fully support NYC's safety initiatives and are dedicated to advancing electric vehicle safety standards.*** We are committed to offering cost-effective, high-performance electric bikes, promoting environmentally friendly travel, and contributing to the city's sustainable development."

62. The statements identified in Paragraph 61 above were materially false and misleading when made because: (a) safety was not then Fly-E's top priority, and it had been repeatedly found in violation of key safety regulations; (b) all of Fly-E's lineup of bikes did not "feature UL-certified lithium batteries for safety"; (c) the Company was not then committed to "provid[ing] a secure" electric riding experience because it was selling unsafe products; (d) the Company was not then "support[ing] NYC's safety initiatives" but rather was thwarting them by falsely labeling uncertified bikes as certified; (e) the statements omitted that the Company was not in compliance with UL Certification Laws, which it was on notice of both from facing violations from local regulators; and, as a result of (a)-(e), (f) the Company had then imperiled its core operation by violating the most important regulation in its most important market.

63. On August 16, 2024, the Company filed its Quarterly Report for the quarter ending June 30, 2024, the first quarter of its 2025 fiscal year ("Q1 2025 Form 10-Q"). Defendants Ou and Guo signed the filing, and both Ou and Guo certified that the financial information in the Q1 2025 Form 10-Q was accurate and that the Q1 2025 Form 10-Q did not contain any untrue statement of material fact.

64. The Q1 2025 Form 10-Q said under its "recent developments" section that the Company had initiated rental services, which it represented would serve the demand for ***UL-certified*** e-bikes:

> ***Rental Services***
>
> ***The Company launched a new rental program to meet the increasing market demand for safe, UL-certified e-bikes in compliance with New York State regulations***. The rental service is now available in New York City in select Fly E-Bike stores, offering users with a flexible and affordable e-bike rental option featuring the Fly-E Fly-11 Pro model. The Company is currently developing the GO FLY app, a mobile application designed for its rental services. As part of FLY-E's growth strategy, the Company plans to expand the rental service to Miami, Toronto, and Los Angeles shortly.

65. The statements identified in Paragraph 64 above were materially false and misleading when made because: (a) the Company's rental program did not involve "safe, UL-certified e-bikes in compliance with New York State regulations"; (b) the statements omitted that the Company was not then complying with the UL Certification Law, and had actual knowledge of this fact as a result of having been repeatedly found guilty of violating this law; and (c) the statements omitted that the Company was then attempting to cover up its lack of certification by using Counterfeit UL Certification Marks in violation of local regulations and federal trademark law.

66. Meanwhile the Company kept getting fined for failure to comply with the UL Certification Law. Between June and November, 2024, the Company received six notices of

violations, consisting of 15 violations, of which, the Company was found guilty of 14 of the violations.

67. Despite repeated findings of fault for violating these provisions, Fly-E, Ou and Guo falsely stated in the Q1 2025 Form 10-Q that "***the Company believes it is in compliance with the relevant regulations in the U.S***."

68. The statements identified in Paragraph 67 above were materially false and misleading when made because: (a) the Company, which was found in violation of the UL Certification Law dozens of times, did not actually believe it was in compliance with relevant regulations; (b) the statements omitted that the Company was not then complying with the UL Certification Law; and (c) the Company was then utilizing Counterfeit UL Certification Marks in violation of local regulations and federal trademark law.

69. Defendants Fly-E, Ou and Guo also boasted in the Q1 2025 Form 10-Q that safety regulations would provide a "tailwind" to growth:

> ***Regulatory Landscape***
>
> We operate in an industry that is subject to extensive environmental, safety and other laws and regulations, which include products safety and testing, as well as battery safety and disposal. ***These requirements create additional costs and possible production delay in connection with the testing and manufacturing of our products. We also benefit from environmental regulations in our target markets which include economic incentives to purchasers of EVs and tax credits for EV manufacturers.*** The Governor of New York State signed a legislative package in July 2024 aimed at raising awareness about the safe use of e-bikes and lithium-ion battery products, prohibiting the sale of non-compliant batteries, requiring safety protocols and training for first responders, mandating operating manuals for e-bike retailers, and improving accident reporting and registration processes for e-bikes and mopeds. Additionally, in July 2025 [sic], the New York City Department of Transportation announced that it anticipated to launch a $2 million trade-in program in early 2025, allowing eligible food delivery workers to replace their unsafe e-bikes, e-mobility devices, and batteries with certified, high-quality versions. ***While we expect relevant regulations to provide a tailwind to our growth, it is possible for other regulations to result in margin pressures***.

70. The statements identified in Paragraph 69 above were materially false and misleading when made because: (a) regulatory requirements were a headwind rather than a tailwind because Fly-E was then not in compliance; (b) the statements omitted that the Company was not then complying with applicable safety laws, including but not limited to the UL Certification Law; (c) the statements omitted that the Company's failure to comply with safety regulations already imperiled its ability to take advantage of the referenced environmental incentives.

71. Defendants Fly-E, Ou and Guo also falsely confirmed in their discussion of "risk factors" in the Q1 2025 Form 10-Q that the e-bikes Fly-E rented were "safe" and "UL-Certified," and that the risk was therefore limited to timing, scale and execution:

> ***Our planned rental service may not be successful.***
>
> ***As we launch our new rental program to meet increasing market demand for safe, UL-certified e-bikes, our success will depend on several critical factors, including our ability to launch the rental services on time, effectively scale operations, manage supply chain logistics, secure necessary rental licenses, maintain the high-quality standards of our e-bikes, and successfully develop and deploy our mobile app for user access***. Delays, challenges in obtaining or renewing rental licenses, difficulties in expanding the service to planned locations, or issues with the mobile app's performance and user experience, could adversely affect our brand, business, financial condition, and future prospects.

72. The statements identified in Paragraph 71 above were materially false and misleading when made because: (a) the e-bikes rented were not "UL-certified"; (b) the e-bikes rented were not "safe"; (c) the statements omitted that the Company was then routinely violating the most important safety law in its most important market, and had already received dozens of violation notices; and, as a result, (d) the rental program and e-bike sales as well were already imperiled by the Company's known safety deviations.

73. On August 19, 2024, the Company issued a press release to announce its first quarter of 2025 results. In that press release, Ou trumpeted increased profits for the Company due to favorable prices for purchasing batteries:

> "Despite the inflationary pressure and intense competition, we have managed to sustain steady expansion with a gross profit increase of 13.8%. Our uptick in financial performance reflects the strategic efforts we have undertaken to expand our market presence and enhance our product offerings. ***This growth has been driven by our commitment to innovation and customer satisfaction, as evidenced by the increase in our average sales price per EV. Also contributing to our gross profit increase is a decrease in our cost of revenue. We achieved this through continued cooperation with our suppliers which resulted in a more favorable price for the company when purchasing batteries***. In addition, we witnessed significant increases in selling and general administrative expenses, primarily driven by the expansion of our retail stores and the strategic investments associated with our initial public offering, which increases were necessary to support our continued growth and the scaling of our operations, positioning us for future success. Looking forward, we are optimistic about our growth prospects and are committed to executing our business plan to achieve long-term success."

74. The statements identified in Paragraph 73 above were materially false and misleading when made because: (a) Fly-E achieved "a more favorable price for the company when purchasing batteries" not due to "continued cooperation with [its] suppliers" but rather by purchasing un-certified batteries and selling them as UL-certified; (b) the statements omitted that the Company had already received dozens of violation notices for failing to comply with the UL Certification Law; and (c) the Company's growth was not "driven by our commitment to innovation" because the Company was not innovative but rather simply a reseller of electric micromobility vehicles manufactured overseas, as confirmed by the deposition of Junchao.

75. On November 8, 2024, the Company announced that Defendant Guo had resigned as Chief Financial Officer and Director of the Company, and announced that Shiwen Feng would replace Defendant Guo.

76. On November 19, 2024, the Company filed its Quarterly Report for the quarter ending September 30, 2024 on Form 10-Q ("Q2 2025 Form 10-Q"). Defendants Ou and Shiwen Feng signed the filing, and both Ou and Shiwen Feng certified that the financial information in the Q2 2025 Form 10-Q was accurate and that the Q2 2025 Form 10-Q did not contain any untrue statement of material fact.

77. In the Q2 2025 Form 10-Q, Defendants Fly-E, Ou and Shiwen Feng made the following statements regarding Fly-E's "UL-certified" rental program:

> ***Rental Services***
>
> ***The Company launched a new rental program to meet the increasing market demand for safe, UL-certified e-bikes in compliance with New York State regulations in October 2024.*** The rental service, available in New York City via the Go Fly rental service mobile app and select Fly E-Bike stores, provides users with a flexible and affordable e-bike rental option featuring the Fly-E Fly-11 Pro model. As part of FLY-E's growth strategy, the Company plans to expand the rental service to Miami, Toronto, and Los Angeles shortly.

78. The statements identified in Paragraph 77 above were materially false and misleading when made because: (a) the e-bikes rented were not "UL-certified"; (b) the e-bikes rented were not "safe"; (c) the statements omitted that the Company was then routinely violating the most important safety regulations, and had already received dozens of violation notices; and, as a result, (d) the rental program and as e-bike sales as well were already imperiled by the Company's known safety deviations.

79. These Defendants also repeated in their Q2 2025 Form 10-Q the false and misleading statement that safety regulations would provide a "tailwind" to growth:

> ***Regulatory Landscape***
>
> We operate in an industry that is subject to extensive environmental, safety and other laws and regulations, which include products safety and testing, as well as battery safety and disposal. ***These requirements create additional costs and***

> ***possible production delay in connection with the testing and manufacturing of our products.*** We also benefit from environmental regulations in our target markets which include economic incentives to purchasers of EVs and tax credits for EV manufacturers. ***The Governor of New York State signed a legislative package in July 2024 aimed at raising awareness about the safe use of e-bikes and lithium-ion battery products, prohibiting the sale of non-compliant batteries, requiring safety protocols and training for first responders, mandating operating manuals for e-bike retailers, and improving accident reporting and registration processes for e-bikes and mopeds.*** Additionally, in July 2024, the New York City Department of Transportation announced that it anticipated to launch a $2 million trade-in program in early 2025, allowing eligible food delivery workers to replace their unsafe e-bikes, e-mobility devices, and batteries with certified, high-quality versions. ***While we expect relevant regulations to provide a tailwind to our growth, it is possible for other regulations to result in margin pressures.***

80. The statements identified in Paragraph 79 above were materially false and misleading when made because: (a) they omitted that the Company was then selling e-bikes with "non-compliant batteries"; (b) they omitted that the Company was not then complying with applicable safety laws, including but not limited to the UL Certification Law, of which it had been found guilty of violating dozens of times; (c) they omitted that the Company was then utilizing Counterfeit UL Certification Marks in violation of local regulations and federal trademark law; and, as a result of (a)-(c), (d) the Company did not then "expect relevant regulations to provide a tailwind to [its] growth."

81. Defendants also incorporated the risk factors identified in Paragraph 71 that the Company's rental program of "safe, UL-Certified" E-bikes "may not be successful." These statements were misleading for the same reasons as in Paragraph 72.

82. The next day, November 20, 2024, the Company issued a press release announcing its second quarter of fiscal year 2025 results. In that press release, Defendant Ou touted the Company's "dedication to innovation" and proclaimed that the Company's products were "setting high safety standards in the electric vehicle industry":

> On the product and market side, we're energized by the success of our recent initiatives. At October's Electrify Expo in New York, our product lineup—featuring 11 models spanning e-bikes, e-motorcycles, and e-scooters, with three newly launched models in the e-motorcycles—drew strong interest and received highly positive feedback. Additionally, the launch of our e-bike Rental Service offers customers a flexible, affordable way to experience our products and positions us well to meet shifting consumer needs. As part of our growth strategy, we're expanding into key markets like Miami, Los Angeles and Toronto and broaden our presence. On the technological front, we are leveraging innovation to enhance customer convenience, including ongoing development of our mobile apps designed to streamline user experiences and provide more features for our customers***. Our involvement in New York City's Trade-in Program for e-bikes and batteries is aligned with our commitment to setting high safety standards in the electric vehicle industry, helping provide UL-certified e-bikes for delivery workers. Moving forward, our dedication to innovation, safety, and superior customer experience is expected to continue to drive growth and enhance value for our shareholders.***

83. The statements identified in Paragraph 82 above were materially false and misleading when made because: (a) Fly-E was not then "setting high safety standards in the electric vehicle industry" but instead was a serial violator of safety standards and laws; (b) the statements omitted that the Company was not then complying with applicable safety laws, including but not limited to the UL Certification Law, of which it had been found guilty of violating dozens of times; (c) the statements omitted that the Company was then utilizing Counterfeit UL Certification Marks in violation of local regulations and federal trademark law; and (d) Fly-E's products were not "innovative"—rather they were simply operating as a reseller of Chinese manufactured goods that came 90 percent assembled when they arrived at the Company's facility.

84. On July 15, 2025, the Company issued a press release in which Ou touted the Company's gross margin and favorable prices from suppliers:

> ***We achieved an improvement in gross margin to 41.1%, supported by cost reductions and more favorable pricing obtained from our suppliers, particularly in battery sourcing. We are positive about our growth prospects despite the dip in revenue caused by short-term external factors, as we have established solid***

> ***reputation and continued to invest in marketing and product diversification. With a focus on innovation, we now offer a broad and growing product portfolio of over 100 models across E-motorcycles, E-bikes, and E-scooters.*** Our rental service, which is already active in New York City, Toronto, and Los Angeles, is gaining strong traction, and we are excited to extend it to Miami and other markets in the near future.

85. The statements identified in Paragraph 84 above were materially false and misleading when made because they omitted the following facts necessary to make them not misleading under the circumstances in which they were made: (a) the Company secured "more favorable pricing" from its suppliers "principally in battery sourcing" by illegally using unauthorized, non-compliant batteries; (b) the Company was still not complying with applicable safety laws, including but not limited to the UL Certification Law; and (c) the Company did not "focus on innovation," but rather resold Chinese designed and manufactured goods.

86. Also on July 15, 2025, Defendants filed a Form 10-K with the SEC wherein the Company announced its financial results for the fiscal year ended March 31, 2025 ("2025 Form 10-K)". The 2025 Form 10-K was signed by Defendants Ou and Shiwen Feng. Defendants Ou and Shiwen Feng also each certified that the financial information contained therein was accurate and that the 2025 Form 10-K did not contain any untrue statement of material fact.

87. The 2025 Form 10-K made the following statement regarding the Company's regulatory landscape, and again repeated that regulations would provide a "tailwind to growth".

> ***Regulatory Landscape***
>
> We operate in an industry that is subject to extensive environmental, safety and other laws and regulations, which include products safety and testing, as well as battery safety and disposal. These requirements create additional costs and possible production delay in connection with the testing and manufacturing of our products. We also benefit from environmental regulations in our target markets which include economic incentives to purchasers of EVs and tax credits for EV manufacturers. The Governor of New York State signed a legislative package in July 2024 aimed at raising awareness about the safe use of e-bikes and lithium-ion battery products, prohibiting the sale of non-compliant batteries, requiring safety protocols and

> training for first responders, mandating operating manuals for e-bike retailers, and improving accident reporting and registration processes for e-bikes and mopeds. ***Additionally, in January 2025, the New York City Department of Transportation launched a $2 million trade-in program, allowing eligible food delivery workers to replace their unsafe e-bikes, e-mobility devices, and batteries with certified, high-quality versions. Our Fly-11 PRO was chosen for the official model of DOT and participates in this program. From January 2025 to June 2025, we participated in this program and completed the delivery of Fly-11 Pro models to our retail partner participating in the program. While we expect relevant regulations to provide a tailwind to our growth, it is possible for other regulations to result in margin pressures.***

88. The statements identified in Paragraph 87 above were materially false and misleading when made because: (a) Fly-E electric micromobility vehicles were not "certified, high quality versions"; (b) the statements omitted that the Company was still not complying with applicable safety laws, including but not limited to the UL Certification Law, of which it had been found guilty of violating dozens of times; (c) they omitted that the Company was then utilizing Counterfeit UL Certification Marks in violation of local regulations and federal trademark law; and, as a result of (a)-(c), (d) the Company did not then "expect relevant regulations to provide a tailwind to [its] growth."

89. Defendants also made the following claim boasting about its "innovative products" as a strength for the Company in the 2025 Form 10-K:

> ***Our Strengths***
>
> ***
>
> ***Innovative Products and Services*: *We continue to offer innovative, differentiated products and services that help set us apart from our competitors.*** Since 2018, we have launched over 67 new products and introduced new versions to our existing products with upgrades to design, motor and battery technology. Additionally, we are developing the Fly E-Bike app, which will be used by customers to better manage and enjoy their riding experience. We are also developing the Fly E-Bike Care, an extended warranty program that will provide value-added options for our customers in the near future.

90. The statements identified in Paragraph 89 above were materially false and misleading when made because: (a) the products were not “innovative”—rather they were simply operating as a reseller of Chinese manufactured goods that came 90 percent assembled when they arrived at the Company’s facility, as confirmed by the depositions of Junchao and Rui Feng; (b) Fly-E’s products were a liability rather than a strength, as indicated by the rampant safety violations the Company was then incurring; and (c) as a simple re-seller of non-compliant goods made overseas, the Company and its products did not “set [them] apart from [their] competitors.”

91. None of the aforementioned misrepresentations and omissions was protected by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 (“PSLRA”), because they fell outside the scope of the safe harbor provision.

92. On July 22, 2025, the Company received two additional notices of violation for failure to comply with the UL Certification Law. Fly-E also received four other notices of violations of the New York administrative code in July 2025.

## IV. Additional Allegations of Scienter

### A. Defendants Admitted Having Access to the Information Concealed from Investors

93. Three of the Defendants (the Company, Ou, and Guo) each admitted in their Consent Judgment with UL but not their statements to investors identified herein that they “had reason to know that they did not have authorization to use the UL Marks” and that “UL previously notified Defendants on multiple occasions that they did not have authorization to use the UL Certification Marks in association with the promotion of the [electric micromobility vehicles].” Defendant Ou specifically had knowledge of the component parts, including the defective batteries. Ou testified in his Harris County deposition that he personally worked on the selection of batteries for Fly-E bike vehicles. Ou Dep. 121:12-18 Ou therefore knew of the safety issues confronting these lithium batteries giving rise to widespread fines. Chief Operating Officer Rui

Feng also testified at his deposition in the Harris County matter that Ou personally selected component parts, including batteries. Rui Feng Dep. 31:9-32:24.

94. Defendants also had knowledge of facts contradicting their statements regarding the design of the electric micromobility vehicles and their supposed "innovative technologies." As senior Fly-E employees conceded, the Company was simply a reseller of Chinese made goods. Both Rui Feng and Technology Support Officer Junchao also testified that electric micromobility vehicles arrive 90% preassembled when Fly-E acquires them from overseas. Rui Feng Dep. 22:19-23:1; Junchao Dep. 9:9-16.

95. Defendants' own statements discussing UL Certification Law, as well as battery fires and the strategic importance of certified, safe batteries, show that Defendants held themselves out as knowledgeable about the concealed information and claimed to understand details surrounding these subjects. At all times, therefore, Defendants either had actual knowledge that their statements to the public were materially false and misleading when made, or made the statements recklessly without regard as to whether their statements were truthful.

### B. That the Misrepresentations Concerned the Core Operations of the Company Bolsters an Inference of Scienter

96. Fly-E's core business was the sale of electric micromobility vehicles, specifically e-bikes, e-scooters, and e-motorcycles, targeting food delivery workers, and its most important geographic market was New York City. Defendants acknowledged understanding that selling their core product in that most important market hinged on satisfying strict safety regulations. Because they understood the importance of the misrepresented material to Fly-E's business, because the operation of their day-to-day responsibilities would certainly expose them to the actual facts about the actual design and manufacturing of the Fly-E bikes and because of the pervasive nature of

internally known safety violations and penalties, it would be absurd to assume that Defendants were unaware of the concealed safety misconduct.

### C. That Defendants Certified Fly-E's Annual and Quarterly Filings to Investors Bolsters Scienter

97. Guo, Ou, and Shiwen Feng's actual knowledge of the falsity of the alleged misstatements and omissions is also supported by their signed Sarbanes-Oxley certifications in Fly-E's Form 10-Qs and Form 10-Ks filed with the SEC, as detailed above.

98. These certifications stated, among other things, that they had reviewed the respective filings to ensure that they "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

99. The Company warned investors of the importance of complying with the regulatory laws, including the UL Certification Law, and repeatedly told investors that "we believe we are presently in compliance with applicable laws and regulations in our operating regions."

100. If Ou, Guo, and Shiwen Feng, had, in fact, made these assessments, then they would have actual knowledge that the Forms 10-Qs and 10-K contained numerous misleading statements about safety, compliance with laws generally and the UL Certification Law specifically, whether regulatory requirements were a tailwind or headwind, and whether the Company was in fact an innovative designer or simply a reseller of existing Chinese designs, and should have informed investors of the truth. If they had not, then they were reckless in making such statements to investors.

### D. The Company's Precarious Position Supports an Inference of Fraud

101. The Company had substantial negative cash flows following its IPO. While the Company had a cash balance of $4.5 million in June 2024, it dropped to $1.3 million on September

30, 2024, and declined even further to $.8 million on March 31, 2025. As Fly-E admitted in July, 2025, without further capital raises, there was substantial doubt as to the Company's ability to continue to operate. Faced with mounting losses, the Company needed to raise capital repeatedly. Had it disclosed the truth, it would have been unable to do so, or to do so at viable prices.

### E. The Widespread Resignations Among Senior Officers and Board Members at the Company Support Scienter

102. On August 20, 2025, less than one week after the Company's disclosure attributing a 32 percent decline in revenue to battery fires, Defendant Shiwen Feng resigned as Chief Financial Officer. The next day, Directors Lun Feng and Zanfeng Zhang resigned from the board. The temporal proximity between these resignations and the Company's disclosure of devastating news that the Company had previously hidden and downplayed contributes to the inference of scienter.

103. In addition, the fact that every director other than Ou who consented to being named as a director at the time of the IPO has resigned bolsters an inference of scienter. At the time of the IPO, the board consisted of Ou, Guo, Bin Wang, Lun Feng, and Alan Jacobs. Other than Ou, all have resigned. In addition to Zanfeng Zhang and Lun Feng's departures, on November 6, 2024, after the Company had been confronted with multiple notices that it had violated the UL Certification Law, Defendant Guo resigned as Chief Financial Officer. Also, on August 15, 2024, Alan Jacobs resigned from the Board of Directors. On October 31, 2025, Director Bin Wang also resigned.

## V. Corrective Events

104. On May 28, 2025, after the stock market had closed, the Company disclosed in a Form 8-K filing that it had entered into a settlement agreement with UL, in which the Company agreed to pay UL $1,000,000 and entered into a Consent Judgment and Permanent Injunction and "agreed not to offer for sale, sell, or distribute products with UL Marks that were not tested and

certified by UL." On this news, the Company's stock price dropped 9.59% the next trading day, closing at $44.30.[11]

105. On August 14, 2025, Fly-E filed with the SEC an NT 10-Q notice on Form 12b-25 conceding its inability to timely file its Quarterly Report for the first quarter of fiscal year 2026. The filing revealed a significant 32% decrease in Fly-E's net revenue compared to the same period in 2024. Significantly, the notice stated that the primary driver for the revenue decrease was a decline of "total units sold" as customers were less inclined to purchase e-bikes due to an "increasing number of lithium battery explosion incidents in New York."

106. The aforementioned press release, NT 10-Q SEC filing and statements made by Defendants were in direct contrast to statements they made in the Company's 10-K Annual Report filed with the SEC on July 15, 2025. In that filing, Defendants repeatedly praised Fly-E's inflated brand reputation in the industry, cost reductions and favorable pricing from suppliers as enabling Fly-E to grow its sales network and improve gross margins forecasted for the fiscal year 2026, while simultaneously minimizing risks associated with supply chain changes and the regulatory environment, the potential impact of the macro environment, and possible demand fluctuations for its e-bikes and e-scooters.

107. Investors and analysts reacted immediately to Fly-E's revelation. The price of Fly-E's common stock declined dramatically. From a closing market price of $155.20 per share on August 14, 2025, Fly-E's stock price fell to close at $20 per share on August 15, 2025, a decline of more than 87% in the span of just a single day. The stock continued to drop the next trading day, closing at $16.02 on August 18, 2025.

[11] The stock prices reflected herein account for the 1 for 5 reverse stock split on July 7, 2025 and 1 for 20 reverse stock split on November 4, 2025. The actual trading price at the time was 1/100th of the listed price after accounting for the stock splits.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

108. Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that purchased or otherwise acquired the Company's common stock between June 6, 2024 and August 14, 2025, seeking to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act. Excluded are Defendants, former and current officers, senior managers, and directors of Fly-E, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a 10% or higher interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above; or any person who acquired shares via conversion of an interest in or obligation of Fly-E that existed prior to June 6, 2024, with respect to such shares.

109. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other Class members may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

110. Plaintiffs' claims are typical of the claims of Class members as all were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

111. Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

112. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Registration Statement contained any material misrepresentations or omissions;
- whether the statements to the investing public after the IPO detailed above misrepresented material facts about the business, operations and management of the Company;
- whether the individual Defendants caused the Company to issue false and misleading statements identified above;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;
- whether the individual Defendants were control persons of Fly-E; and
- whether Class members have sustained damages and, if so, what is the proper measure of damages.

113. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

114. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the Company's securities traded in an efficient market;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ;
- Company-specific information regarding the Company's products and safety compliance was rapidly conveyed to investors via press

releases, news coverage, message board postings, and social media, and impounded into the share price of FLYE

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

115. Based upon the foregoing, Plaintiffs and Class members are entitled to a presumption of reliance upon the integrity of the market.

116. Alternatively, Plaintiffs and Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the claims herein are based primarily on Defendants' omission of material information in their statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

117. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

118. This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

119. In connection with the IPO and during the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of

material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fly-E common stock; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire Fly-E common stock at artificially inflated prices.

120. Defendants acted with scienter in that they knew or deliberately disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's materially misleading statements, and/or their associations with the Company, were privy to confidential proprietary information concerning the Company and participated in the fraudulent scheme alleged herein.

121. Each had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to be deceitful, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel.

122. Defendants Ou and Guo were directors of the Company and knew they had a duty to make a reasonable investigation into the statements contained therein, and were able to make

such investigation. Each either knowingly signed the Registration Statement effecting the IPO despite knowing as a result of such investigation that the statements identified above as being contained therein contained material omissions and were otherwise false and misleading, or recklessly did so without making the factual investigation anticipated under federal securities laws. Each had the ability to control the IPO by withholding signature until the omitted material was disclosed and all other materially false and misleading statements corrected.

123. Defendants Ou, Guo and Shiwen Feng were officers of the Company during the Class Period and signed ***and*** certified the periodic SEC filings identified above. Each knew they had a duty to make a reasonable investigation into the statements contained therein, and were able to make such investigation. Each either knowingly signed such statements despite knowing that the statements identified above as being contained therein contained material omissions and were otherwise false and misleading, or recklessly claimed in their certifications to having made a factual investigation they did not actually make. Each had the ability to control the SEC filings by withholding signature or certification until the omitted material was disclosed and all other materially false and misleading statements corrected.

124. As a result of the foregoing, the market price of Company securities was artificially inflated during the Class Period. Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Company securities during the Class Period in purchasing Company securities at prices that were artificially inflated as a result of these Defendants' false and misleading statements.

125. Had Plaintiffs and the other Class members been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would

not have purchased Company securities at the artificially inflated prices that they did, or at all.

126. As a result of the wrongful conduct alleged herein, Plaintiffs and other Class members have suffered damages in an amount to be established at trial.

127. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other Class members for substantial damages which they suffered in connection with their purchase of Company securities during the Class Period.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against Defendants Ou, Guo, and Shiwen Feng)**

128. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

129. Defendants Ou and Guo were executives and/or directors of the Company at the time of the IPO and signed the Registration Statement. Both had the ability to control Fly-E's disclosures to investors in the Registration Statement by withholding signature until the omitted material was disclosed and all other materially false and misleading statements corrected. These signatories, therefore, were "controlling persons" of Fly-E within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Fly-E shares.

130. Defendants Ou, Guo and Shiwen Feng participated in the operation and management of the Company during the Class Period, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, including the Company's operations, its safety compliance, and its interaction with regulators. Because of their senior

positions, they knew the adverse non-public information about the Company's false and misleading statements, and in fact. Each signed ***and*** certified the periodic SEC filings identified above, and had the ability to control Fly-E's disclosures to investors in those SEC filings by withholding signature or certification until the omitted material was disclosed and all other materially false and misleading statements corrected. These officers, therefore, were "controlling persons" of Fly-E within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Fly-E shares.

131. As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

132. Because of their positions of control and authority as senior officers, and their day-to-day responsibilities in the management of Fly-E, Ou, Guo, and Shiwen Feng were further able to, and did, control the contents of the various reports, press releases and public filings which Fly-E disseminated in the marketplace during the Class Period concerning Fly-E's results of operations. Throughout the Class Period, Ou, Guo, and Shiwen Feng exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.

133. By reason of their senior management positions and/or being directors of Fly-E, and the specific roles described above, Ou, Guo, and Shiwen Feng each had the power to direct the actions of, and exercised the same to cause, Fly-E to engage in the unlawful acts and conduct complained of herein. Each of them exercised control over the general operations of Fly-E and

possessed the power to control the specific activities that comprise the primary violations of Fly-E about which Plaintiffs and the other members of the Class complain.

134. By reason of the above conduct, Ou, Guo, and Shiwen Feng are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fly-E. Each is also liable for their own primary violations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: September 14, 2026

Respectfully submitted,

**POMERANTZ LLP**

By: /s/ *Brian P. O'Connell*

Joshua B. Silverman
(*pro hac vice* forthcoming)
Brian P. O'Connell
(*pro hac vice*)
10 S. LaSalle Street, Suite 3505

Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
boconnell@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Lead Plaintiffs*

**KEHOE LAW FIRM, P.C.**
Michael K. Yarnoff
2001 Market Street
Suite 2500
Philadelphia, PA 19103
Tel: (215) 792-6676
myarnoff@kehoelawfirm.com

*Additional Counsel for Lead Plaintiffs*